498 So.2d 1072 (1986)
Joseph S. VUSKOVICH
v.
Geraldine V. THORNE, Executrix of the Succession of Vincent Vuskovich, et al.
No. 85-C-1008.
Supreme Court of Louisiana.
November 24, 1986.
*1073 Roy M. Bowes, Gretna, Mack E. Barham, Robert E. Arceneaux, Barham & Churchill, New Orleans, for defendant-applicants.
Peter Butler, Aubrey Hirsch, Jr., M. Shawn McMurray, Butler, Heebe & Hirsch, New Orleans, for plaintiff-respondent.
LEMMON, Justice.[*]
This is an action for partition by licitation of Lot C-7 of Oakdale Subdivision in Jefferson Parish. The lot sought to be partitioned is one of several lots subdivided from the Vuskovich family estate and is presently owned in two equal proportions by Joseph Vuskovich and by the succession of Joseph's deceased brother. The principal issues include (1) whether La.C.C. Art. 1303, which prohibits partition under certain circumstances, is applicable directly or by analogy, and (2) whether Joseph's right of partition between co-owners should be denied on the basis of his alleged abuse of right or breach of fiduciary duty as trustee of the trust established by his brother.

Facts
Lot C-7 and the surrounding lots are shown on the following map:
*1074 
In 1970, Visko's, Inc., a corporation whose stock was owned by Joseph and Vincent Vuskovich, opened a seafood restaurant in the building on Lot C-7. In 1974, a fire destroyed the building on Lot C-7. The two brothers purchased the lot in their individual names and built a new building.
In 1975, the two brothers leased the lot and building to Visko's, Inc. for operation of a restaurant. The ten-year lease contained an option to purchase at any time during the term of the lease at "CAB value".
Since the building covered almost the entirety of Lot C-7, Visko's, Inc. provided parking for the restaurant customers on Lot C-9, which was owned by MATO-V Enterprise, Inc. (MATO-V), a corporation whose stock was owned entirely by the Vuskovich family. However, Visko's, Inc. had no written or verbal lease or other formal agreement regarding the use of Lot C-9.
*1075 In July, 1975, Vincent sold all of his shares in Visko's, Inc. to his brother, Joseph, for value.[1] At the time of the sale, Vincent was aware that his life expectancy was short because of a serious heart condition.
Vincent died on May 13, 1977. In his last will and testament, he made certain special bequests and left the remainder of the estate (including his interest in Lot C-7) in trust to his minor son. The will established the trust and named Joseph and a sister, Geraldine V. Thorne, as co-trustees. Although Joseph neither accepted the appointment nor performed any acts in the capacity of a trustee, he did not expressly renounce the appointment until 1982 (after this action was filed).
In May, 1978 (between Vincent's death and the time Joseph renounced his appointment as trustee), Joseph purchased Lot C-9 for $143,680 from MATO-V and paved the lot for parking use.[2] In January, 1979, Joseph purchased Lot C-8 from other members of the Vuskovich family.[3] The building on Lot C-8 had been used by Joseph for the operation of an adjunct seafood restaurant called the Steamroom, and the two restaurants were joined by a covered walkway. Vincent also purchased Lot C-3-A in March, 1981 and leased Lot C-3-B in January, 1982.
In April, 1982, Joseph filed this action against Vincent's minor son and the executrix of Vincent's succession, seeking a partition by licitation of Lot C-7. Defendants filed an exception of no cause of action which asserted that Joseph held the legal title to the entirety of Lot C-7, one-half in his own right and one-half as trustee. Joseph immediately executed a formal renunciation of his appointment as co-trustee.
After the exception was overruled, defendants filed an answer which asserted that Joseph's breach of his fiduciary duty to the minor precluded his right to a partition. The answer also alleged that Joseph had purchased and leased the surrounding properties to deprive the restaurant building on Lot C-7 of almost all parking area and thus to eliminate the possibility of competitive bidding in a public sale of Lot C-7, and that Joseph had withheld payments to the Succession of the purchase prices of Lot C-8 and C-3-A and the rent on Lot C-3-B.
After a trial on the merits, the trial court rejected Joseph's request for a partition by licitation on the basis of La.C.C. Art. 1303.[4] The judge noted that the buildings on Lots C-7 and C-8 were connected by a covered walkway and concluded that the peculiar configuration of these lots made them dependant on one another for ingress, egress and usage. Accordingly, the judge ruled that La.C.C. Art. 1303 was applicable and prohibited a partition.
On appeal, the intermediate court reversed. 466 So.2d 619. The court interpreted Article 1303 literally and held it was applicable only to "coheirs". Because Joseph acquired Lot C-7 by purchase and not by inheritance, he and the succession were not "coheirs", but were coproprietors with respect to the property sought to be partitioned. The court therefore ordered a partition by licitation with a minimum bid price. We granted certiorari. 472 So.2d 24.

Applicability of Article 1303
Article 1303 has never been judicially *1076 interpreted.[5] The article by its terms requires two elements: (1) the property sought to be partitioned must be owned in common, and (2) the common ownership must be indispensable to the enjoyment of other properties by the co-owners.
As noted earlier, the court of appeal held Article 1303 was applicable only to the partition of succession property. Article 1303 arguably applies to coproprietors as well as coheirs, since La.C.C. Art. 1290 makes the succession articles on partition applicable to partitions among coproprietors. Nevertheless, even if the term "coheirs" encompasses coproprietors, the essential elements of Article 1303 are not present in this case.
The trial judge's decision to apply Article 1303 was based on the theory that the common use of Lot C-7, C-8 and C-9, because of the peculiar configuration of the lots, was indispensable to the coproprietors. However, Lots C-7, C-8 and C-9 were not owned in common, Lots C-8 and C-9 being owned solely by Joseph, and the requirement of common ownership, necessary for a determination of indivisibility of a tract composed of Lot C-7, C-8 and C-9, was missing.
If Article 1303 is applicable to Lot C-7, the only property owned in common, the result is forced indivision in perpetuity.[6] However, forced indivision is intended for things which are destined to the common use of several pieces of property. See M. Planiol, Traite Elementaire de Droit Civil § 2501 (Louisiana State Law Institute trans.1959). When co-owned property is an indispensable accessory for two or more principal estates so that the principal estates are substantially less useful without the common use of the accessory property, the co-owned accessory property cannot be partitioned. 2 Aubry & Rau, Droit Civil Francais § 221(3) (7th ed. 1961, Louisiana State Law Institute trans.). Therefore, in order for Article 1303 to be deemed a bar to the partition of Lot C-7, the perpetual indivisibility of Lot C-7 must be indispensable to the co-owners to enable them to enjoy or to derive an advantage from other property. Here, Lot C-7 does not constitute accessory property which is indispensable to the enjoyment of two or more principal estates, and Article 1303 is not applicable.
Furthermore, Article 1303 was intended as only a minor restriction on the right to partition. See Comment, Ownership in Indivision in Louisiana, 22 Tul.L. Rev. 611 (1948). Similar to the limitations on partition for fixed periods of time, the limitation expressed in Article 1303 should be strictly construed.

Breach of Fiduciary Duty and Abuse of Right
Defendants contend that Joseph should be denied the right to partition the property because he breached his fiduciary duty as trustee by dealing with trust property for his own interest while delaying rejection of his appointment as trustee. Defendants argue that Joseph violated his obligation to the trust by purchasing Lot C-9 for himself individually, from himself as trustee for one of the owners, in an obvious conflict of interest between his position as buyer and his fiduciary position for one of the sellers.[7]
Even if we accept for purpose of argument defendants' assertion that we should disregard the corporate entity and treat the shareholders as owners of the property, that piercing of the corporate veil would be significant primarily in a suit to set aside Joseph's purchase of Lot C-9. Defendants' argument that Joseph purchased Lot C-9 from himself as trustee appears to *1077 have only marginal relevance as a defense in an action for partition by licitation of Lot C-7.
The crucial problem which prompted our granting certiorari was the possibility that Joseph bought Lot C-9 (no matter whether that lot was owned by the trust or by a third party) while he deliberately delayed renouncing his appointment as trustee and prevented anyone from acting on behalf of the trust to compete for the property or to seek joint acquisition. Such a breach of fiduciary duty, if proved, could perhaps give rise to a claim for damages, or to an action to set aside the sale of Lot C-9, or to construing the purchase of Lot C-9 as an acquisition for the joint benefit of the minor. However, defendants did not seek any such relief in this action.[8] Any breach of fiduciary duty which may have been suggested in this record did not constitute a defense in this action for partition by licitation of Lot C-7.
Defendants also contend that Joseph's right to partition should be denied because his "severance of Lot C-9 from its former owners and from its relationship with Lot C-7, combined with the recorded lease and its purchase option", constituted an abuse of right. One may not exercise rights for the exclusive purpose of harming another or without serious and legitimate interest. See generally Cueto-Rua, Abuse of Rights, 35 La.L.Rev. 965 (1975). However, Joseph's exercise of his right to partition in this case is far different from a landowner's building an extraordinarily high spiked fence adjacent to a narrow landing strip for dirigibles for the purpose of forcing the strip owner to buy the adjacent land at an unreasonable price. Judgment of August 3, 1915, Cass. req., Fr., 1917 Recueil Periodique et Critique I 79.
Here, defendants are in the situation of being an owner in indivision of property, which the co-owner seeks to have partitioned by licitation at a judicial sale at which no third party is likely to bid an amount near the appraised value of the property (when considered with a parking lot). This situation was created, however, when Joseph and Vincent spent substantial sums purchasing land and constructing a building without securing the use of Lot C-9 by purchase or long-term lease for use as a parking lot. If either co-owner immediately after the construction had sued for partition, the other co-owner would have found himself in exactly the same position, facing a judicial sale at which no third party would be likely to bid an amount approaching the value to the owners. The basic problem is that Lot C-7, then and now, is not nearly as valuable without the parking lot.[9] That difference in value was created by the action of Joseph and Vincent in 1975, not by Joseph's purchase of Lot C-9 in 1979. Defendants' situation did not change when Joseph acquired Lot C-9, because defendants never had any right of control as to the use of Lot C-9 (although the trust held ten per cent of the stock in the corporation which owned the property).
Partition by licitation often results in harsh consequences to the co-owner in the less favorable economic position. Any possible abuse in this case, however, appears to be in relation to the circumstances surrounding the acquisition of Lot C-9, as discussed above, rather than to Joseph's exercise of his long-standing right to partition Lot C-7. Loss from that abuse may perhaps be the proper subject of a damage action, but does not constitute a ground for denial of the right to partition.
For these reasons, the judgment of the court of appeal is affirmed.
DENNIS, J., dissents with reasons.
DENNIS, Justice, dissenting.
I respectfully dissent.
Although my brethren certainly would agree with Justice Cardozo that "A trustee is held to something stricter than the morals *1078 of the market place.... a level higher than that trodden by the crowd", Meinhard v. Salmon, 164 N.E. 545, 546-47, 249 N.Y. 458 (1928), the majority opinion deals leniently with the trustee in this case and establishes a low standard of protection for trust beneficiaries in this state. The majority opinion, contrary to universally accepted principles of trust law, allows a trustee who has tacitly accepted the trust, has committed several breaches of his duty of loyalty, and has even brought a suit in his own behalf against the trust he is duty-bound to protect and administer, to nevertheless resign and withdraw from his trusteeship without any security, penalty or even an accounting. Moreover, the majority opinion, again breaking from established trust law, approves of the trustee's resignation without affording any remedy to the minor beneficiary in these proceedings, but relegates him to future additional litigation from which he may obtain only an unsatisfied judgment for damages ranked behind a long line of the trustee's previous creditors.
Joseph Vuskovich tacitly accepted the trust for the benefit of his minor nephew by: (1) Consenting to the request of his brother, Vincent, prior to Vincent's death to become the trustee for the benefit of Vincent's minor son. There is only circumstantial evidence of such an agreement but it is inconceivable that one did not exist considering the brothers' daily business associations, family relationship and Vincent's appointment of Joseph as trustee in his will. (2) Delaying his "renunciation" of the trust for almost five years, even though he knew he had been appointed trustee in Vincent's will, and even though he engaged in transactions contrary to the economic interest of the trust during this period. (3) Making support payments to the minor beneficiary in accordance with the instructions in the testementary trust.
The Louisiana Trust Code neither expressly recognizes nor prohibits a tacit acceptance of a trust by a trustee. The trust code merely provides that the trustee "may accept the trust in the trust instrument or in a separate instrument", La.R.S. 9:1755, and that if he was not a party to the trust instrument, "he must accept the trust in writing within a reasonable time after its creation, or the proper court shall appoint a trustee." La.R.S. 9:1824. However, comment (d) of the latter section notes that the Restatement of Trusts 2d, Section 102, states that "A trustee's acceptance or disclaimer is to be determined on the basis of his words or conduct ..." This is a reference to the universal rule which provides that, while an express acceptance of a trust is effective and unequivocal, a tacit acceptance produces the same legal result and may be shown by any conduct of the trustee that indicates that he understood and accepted the trust. G.G. Bogert, G.T. Bogert Handbook of the Law of Trusts, § 31 (5th ed. 1973); Restatement (Second) of Trusts, § 102 (1959); J.W. Perry, A Treatise on the Law of Trusts and Trustees, Vol. 1 §§ 260, 261, 267 (7th ed. 1929). Furthermore, if the trustee's acts are ambiguous, or it is doubtful whether he intended to accept, or to act in some other capacity, the doubt will be resolved against him, and he will be construed to have accepted the trust and all its responsibilities. Perry, supra, § 261.
There is no reason this court should deviate from the universal tacit acceptance rule. The trust code does not adopt a contrary rule. The comment refers to the Restatement discussion of tacit acceptance with approval. The report of the Law Institute to accompany the proposed La.Trust Code stated that the fiduciary relationship created by a trust is no different from the relationship of an administrator or executor to the heir or legatee, of a curator to an interdict, of a tutor to a minor, of a curator to an interdict, or from the relationship created by the fiducie of French law, derived from the Roman law. Report by the La.State Law Inst. to Accompany the Proposed Trust Code 3A La.R.S. (1965). Tacit acceptance of the fiduciary capacity has been recognized with respect to many of these relationships. Way v. Levy, 6 So. 661, 41 La.Ann. 447 (1889); Butler v. Her Creditors, 5 Mart. (N.S.) 624 (La.1827). 3A *1079 West's LSA Revised Statutes, XXXII, XXXVI (1965). It is inconceivable that our law would permit a person appointed trustee to tacitly accept the trust, take actions injurious to the property or interests of his purported beneficiary, and yet not be held to the stricter standard of a fiduciary merely because of the lack of technical, formal acceptance.
When Joseph Vuskovich accepted the trust by his conduct, his acceptance by law was retroactive to the date of creation of the trust. La.R.S. 9:1823. Consequently, on the date he commenced this suit to partition the trust property he was the trustee and, therefore, the legal titleholder of that very property. Consequently, the exception of no cause of action filed in behalf of the trust and the minor beneficiary should have been sustained. A trustee cannot be permitted to sue the trust that it is his fiduciary duty to defend and promote. Rather, he is obliged to defend actions that may result in a loss to the trust. La.R.S. 9:2093.
After the exception of no cause of action had been filed Joseph Vuskovich attempted to renounce his appointment as trustee and was permitted to continue the prosecution of this suit. Thus, Vuskovich ostensibly was allowed to proceed against his beneficiary and the property he held in trust, against a non-existent legal owner, without the appointment of a new trustee, and all in perpetuation of his breach of fiduciary duty to administer the trust solely in the interest of the beneficiary. La.R.S. 9:2082.
I cannot believe that our law permits a trustee to bail out of his fiduciary duties in the middle of a lawsuit that he has filed contrary to his beneficiary's interestnot scot-free, without first obtaining court approval and without conditions imposed to protect the beneficiary. The universal rule is that a trustee may resign only with the permission of the proper court and with the consent of the beneficiaries. Restatement of Trusts 2d, § 106; Bogert, § 31; Perry, § 274; A. Scott, The Law of Trusts, § 102.2-3 (ed. 1967). Before acting the court may require the presentation of a satisfactory accounting, showing that the trustee has performed his duties, or if he violated the trust, that he has reimbursed the trust funds for the resulting loss, or that he has complied with any other condition imposed by the court. Bogert § 31; Perry, § 274; Scott, § 102.3.
The Louisiana Trust Code provides only that a trustee "may resign at any time by giving written notice of resignation to each of the beneficiaries...." La.R.S. 9:1788. The code does not explicitly state when the resignation becomes effective or whether the court may require an accounting, reimbursement or other safeguards. Nor does the code provide any procedure for the appointment of a new trustee or state whether any proceedings involving the trust should be stayed when a vacancy is caused by the resignation. Moreover, although the code requires that a trustee must give written notice to each beneficiary in order to resign, it does not explain how that may be accomplished when the beneficiary is a minor.
The trust code does provide that a trustee who has resigned or who has been removed has no further authority with respect to the trust. La.R.S. 9:1790 (His resignation or removal does not affect his liability for actions occurring before his resignation or removal. Id.) Also, the trust code states that a judgment or an order by a court appointing or removing a trustee shall be executed provisionally, that an appeal must be taken and security furnished within thirty days, and that the appeal shall be heard by preference. La.R.S. 9:1791. These provisions are similar to and based on procedural rules governing the resignation or removal of a tutor. See L.C.C.P. 4235; 4068.
Whenever the trust code is silent, resort shall be had to the Civil Code or other laws, but neither the Civil Code nor any other law shall be invoked to defeat a disposition sanctioned expressly or impliedly by the trust code. La.R.S. 9:1724. Because the trust code's procedure governing the resignation and replacement of a trustee contains many gaps which appear to threaten *1080 the interests and due process rights of beneficiaries, it is appropriate and within inherent judicial authority that resort be had to other laws. Since the pertinent trust code provisions are based primarily on the tutorship articles of the Code of Civil Procedure, the courts should invoke these provisions insofar as they do not defeat any dispositions sanctioned by the trust code.
Accordingly, the resignation by a trustee must be considered effective only when a successor is appointed and when his final account has been filed and homologated. Cf. L.C.C.P. art. 4233, 4392-98. When a trustee resigns, another trustee must be appointed in his place in the manner provided for on original appointment. Cf. L.C. C.P. art. 4237. A trustee must file an account annually, reckoning from the day of his appointment, and at any other time when ordered by the court on its own motion or on the application of any interested person. La.R.S. 9:2088; Cf. L.C.C.P. art. 4391. In essence, although the court may not prevent a trustee from resigning under the trust code the court can and should invoke virtually any and all of the traditional safeguards to protect the beneficiary and hold the trustee accountable.
From the record designated for our review, and within the time available for preparing this dissenting opinion, I have been unable to determine whether proper and constitutional notice was given to the minor beneficiary of the trustee's resignation, whether a successor trustee was appointed, or whether the proceedings were tried partially or wholly without a duly appointed trustee. However, it is clear that the proceedings below were conducted with virtually none of the procedural safeguards which have traditionally been required when a trustee attempts to resign. Consequently, in my opinion, the exception of no cause of action should be sustained and the case remanded to permit the parties to replead and the trial court to consider implementing the safeguards described herein. Even if the exception is not sustained, the proceedings below were so lacking in due process and fairness that in the interest of justice their judgments should be vacated and the case remanded for a new trial.
In the event the case is not remanded, remedies and relief should be afforded to minor trust beneficiary by this court. I disagree with the majority opinion that protection of the minor beneficiary's interests must be delayed and relegated to another lawsuit involving only damages.
Joseph Vuskovich appears to have committed serious breaches of trust by: (1) Dealing on the trustee's account by acquiring for himself property from the trust; (2) Engaging in competition with the trust by acquiring several parcels of property surrounding the trust property; and (3) Failing to administer the trust solely in the interest of the beneficiary by filing suit against the trust for partition of the trust property and by seeking to abandon the beneficiary without a fiduciary while continuing the litigation against his interests. Joseph's acquisition of the adjacent and intertwined tracts surrounding the restaurant complex depressed the value of the trust property and placed the trust's economic position at a disadvantage. Title to the adjacent property was held by a family corporation which the trial court, with justification, found to be a thin reed corporation undeserving of corporate entity privileges. Thus, the majority opinion's brusque dismissal of the trial judge's well founded findings to this effect is unwarranted.
The minor beneficiary should not be reduced to seeking damages as his only remedy for these breaches, which in reality, may be no remedy at all. Counsel for the trustee asserted in oral argument that the trustee is on the verge of bankruptcy. The majority's solution is an easy one for this court but it may place the minor at the end of a long line of unsatisfied creditors with a hollow judgment.
Far from being limited to damages, the penalties and remedies available in case of breach of the duty of loyalty by a trustee traditionally are manifold and within the discretion of the court. For example, where the trustee fails to purchase specific property which it is his duty to purchase, under one remedy the beneficiary can *1081 charge him with its value at the time of the decree together with the income which would have accrued thereon if he had purchased it; or require him to purchase such property if it is reasonable under the circumstances and hold it in trust, paying therefor out of the trust property only so much as he would have had to pay if he had properly purchased it, and charge him with the income which would have accrued thereon if he had properly purchased it. See Restatement of Trusts 2nd § 211. Furthermore, as noted above, the court may require the trustee to render an accounting and make these adjustments as a condition of his resignation and discharge. The trust code lists liabilities of a trustee and actions available to a beneficiary. La. R.S. 9:2201; 2221. However, the lists are neither exclusive nor exhaustive statements of the remedies available and certainly were not intended to prevent the courts from invoking equitable relief in the aid of minors. See, e.g., Restatement of Trusts, 2nd, §§ 197-226A.
This court will have defaulted on its responsibility to hold trustees to a high standard of fiduciary loyalty if it does not require some or all of the protections and conditions available before approving the resignation and discharge of the trustee.
NOTES
[*] Blanche, J., retired, participated in this case ad hoc in place of Cole, J., the matter having been heard and submitted before Justice Cole replaced Justice Blanche on the Court.

Judge Felix H. Savoie, Jr. of the Court of Appeal, First Circuit, participated in this decision as Associate Justice ad hoc in place of Justice Watson, who was recused.
[1] Joseph expressly assumed certain debts of Vincent and Visko's, Inc. in the amount of $194,000. Vincent agreed to remain as manager of the restaurant for two years.
[2] Evidence at trial established that the appraised value of Lot C-9 was $134,000.
[3] The sale of the interest owned by the Succession of Vincent was signed by Geraldine as administratrix, pursuant to court authority.
[4] La.C.C. Art. 1303 provides:

"There can be no partition, when the use of the thing held in common is indispensable to the coheirs, to enable them to enjoy, or to derive an advantage from the portion of the effects of the succession falling to them, such as an entry which serves as a passage to several houses, or a way common to several estates, and other things of the same kind."
[5] This article has been cited in dicta in a mineral law case, Gulf Refining Co. of Louisiana v. Hayne, 138 La. 555, 70 So. 509 (1915).
[6] Lot C-7 was clearly not indivisible by nature when Joseph and Vincent built a new building on virtually the entire lot without concern about the absence of any parking area under their control.
[7] As noted above, the record establishes that the value of Lot C-9 at the time of the sale was slightly less than the purchase price.
[8] Counsel informed the court in oral argument that a tort suit was pending in the district court.
[9] The appraiser assigned a seventy per cent decrease in the value of Lot C-7 and the building if parking is not available.